**U.S. BANKRUPTCY COURT**
**District of South Carolina**

Case Number: **09-04740-dd**

Adversary Proceeding Number: **11-80115-dd**

**ORDER**

The relief set forth on the following pages, for a total of 20 pages including this page, is hereby ORDERED.

**FILED BY THE COURT**
**09/25/2012**



／s／ David R. Duncan

David R. Duncan
US Bankruptcy Judge
District of South Carolina

Entered: 09/26/2012

**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF SOUTH CAROLINA**

| | |
|---|---|
| In re,<br><br>Charles E. Riley,<br><br>　　　　　　　　　　　　　Debtor.<br><br>Carrington Mortgage Services, LLC, servicer for Deutsche Bank National Trust Company, as Trustee for Carrington Mortgage Loan Trust, Series 2005-NC1 Asset Backed Pass-Through Certificates,<br><br>　　　　　　　　　　　　　Plaintiff,<br><br>v.<br><br>Charles E. Riley, W. Ryan Hovis,<br><br>　　　　　　　　　　　　　Defendants. | C/A No. 09-4740-DD<br><br>Adv. Pro. No. 11-80115-DD<br><br>Chapter 7<br><br>**ORDER** |

　　　　This matter is before the Court on the adversary complaint filed by Carrington Mortgage Services, LLC, servicer for Deutsche Bank National Trust Company, as Trustee for Carrington Mortgage Loan Trust, Series 2005-NC1 Asset Backed Pass-Through Certificates ("Plaintiff") on July 13, 2011 against Charles E. Riley ("Defendant Riley") and W. Ryan Hovis ("Trustee"), seeking an order allowing its claims and determining that Plaintiff's claimed security interest in real property and insurance proceeds is valid and has priority over Defendant Riley's exemption claim and Trustee's interest.  Defendant Riley filed an answer and counterclaim for violation of the South Carolina Unfair Trade Practices Act on August 29, 2011.  Trustee filed an answer on October 3, 2011.  Plaintiff filed a reply to Defendant Riley's counterclaim on September 22, 2011.  The Court entered an initial scheduling order on October 17, 2011.  After numerous

1

motions,[1] extensions of discovery deadlines, and amendments to the parties' pleadings, a trial was held on July 24, 2012. The Court now makes the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

In December 2004, Defendant Riley and Tessa Spigner executed and delivered two notes and mortgages to New Century Mortgage Corporation ("New Century").[2] The mortgaged property was Defendant Riley's residential property located at 34 Crossbow Lakes Court, Columbia, South Carolina. Ms. Spigner has an interest in the real property but is not otherwise involved in these proceedings. New Century filed a chapter 11 bankruptcy case on April 2, 2007 in the United States Bankruptcy Court, District of Delaware. In October 2007, New Century assigned the notes and mortgages to Deutsche Bank National Trust Company, as Trustee for Carrington Mortgage Loan Trust, Series 2005-NC1 Asset Backed Pass-Through Certificates ("Deutsche Bank"), and the assignments were recorded on October 30, 2007, and November 13, 2007, respectively.[3]

The mortgages executed by Defendant Riley and Ms. Spigner required them to maintain insurance on the property. However, the mortgagors failed to do so, and effective July 17, 2007, Plaintiff, as it was permitted to do under the terms of the mortgages, obtained an insurance policy

---

[1] Plaintiff filed a Motion for Summary Judgment on January 18, 2012, to which Trustee objected on February 2, 2012. A hearing was held on a motion to extend deadlines set forth in the Court's scheduling order and a motion to amend answer on January 31, 2012. At that hearing, the Motion for Summary Judgment was discussed, and the parties agreed no hearing should be held on the Motion for Summary Judgment until after the amended answer and reply were filed, at which time the parties could file additional motions for summary judgment. The Court informed the parties that it believed based on the record already established that there were material issues of fact and that it would be necessary to proceed to trial. No further summary judgment motions were filed. Since no formal ruling was ever entered on the Motion for Summary Judgment, the Court now denies that motion.
[2] The notes and mortgages were admitted into evidence as Plaintiff's Exhibits A, B, D, and E.
[3] The assignments were admitted into evidence as Plaintiff's Exhibits C and F.

2

on the residence through Safeco Insurance ("Safeco").[4] Defendant Riley purchased a casualty insurance policy from Nationwide Insurance Company ("Nationwide") on July 23, 2007. Plaintiff was listed as a loss payee on the Nationwide policy. On August 1, 2007, a fire destroyed the residence. On August 9, 2007, Plaintiff cancelled the Safeco policy and subsequently requested that Safeco retroactively adjust the cancellation date to July 23, 2007, the effective date of the Nationwide insurance policy purchased by Defendant Riley.[5]

Defendant Riley and Ms. Spigner's first mortgage with New Century contains the following clause relating to insurance:

> 5. Property insurance.
> Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably.
> . . .
>
> If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

---

[4] Plaintiff obtained an insurance policy on the residence prior to the date of the assignments from New Century.
[5] Two letters to Ms. Spigner and Defendant Riley were admitted into evidence as Defendant Riley's Exhibit 7. The first of those letters, dated September 11, 2007, provided notice that the Safeco policy had been cancelled effective August 9, 2007. The second letter, dated September 19, 2007, states that the cancellation date was adjusted to July 23, 2007.

> All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.
>
> In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.
>
> If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 22 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

Plaintiff's Exhibit B. The second mortgage states:

4

> 5. Hazard Insurance
>
> Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and such other hazards as Lender may require and in such amounts and for such periods as Lender may require.
>
> The insurance carrier providing the insurance shall be chosen by Borrower subject to approval by Lender; provided that such approval shall not be unreasonably withheld. All insurance policies and renewals thereof shall be in a form acceptable to Lender and shall include a standard mortgage clause in favor of and in a form acceptable to Lender. Lender shall have the right to hold the policies and renewals thereof, subject to the terms of any mortgage, deed of trust or other security agreement with a lien which has priority over this Mortgage.
>
> In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower.
>
> If the Property is abandoned by Borrower, or if Borrower fails to respond to Lender within 30 days from the date notice is mailed by Lender to Borrower that the insurance carrier offers to settle a claim for insurance benefits, Lender is authorized to collect and apply the insurance proceeds at Lender's option either to restoration or repair of the Property or to the sums secured by this Mortgage.

Plaintiff's Exhibit E.

Plaintiff commenced a foreclosure action against Defendant Riley on November 16, 2007. Plaintiff and Defendant Riley subsequently entered into a forbearance agreement, but Defendant Riley defaulted on that agreement and the case was returned to the state court's active docket. The foreclosure was stayed due to Defendant Riley's bankruptcy filing on June 29, 2009. Plaintiff's initial proofs of claim, filed as to the first mortgage on August 27, 2009 and as to the second mortgage on November 6, 2009 indicate that the amounts of arrearage on the first and second mortgages at the time of the filing of the bankruptcy petition were $82,611.44 and $27,160.84, respectively.[6] The proofs of claim indicate a lien on real estate and contain the following notation: "Carrington also claims an interest in the funds in the checking account with Bank of America. (These funds were proceeds from a check made payable to both Charles E. Riley and Carrington Mortgage Services, LLC)." The total secured claim is for nearly $400,000.

---

[6] Plaintiff's original proofs of claim and the first amended proofs of claim, filed September 23, 2009 as to the first mortgage and May 6, 2010 as to the second mortgage, were admitted into evidence as Defendant Riley's Exhibit 16.

Defendant Riley commenced litigation against Safeco and Nationwide in state court in 2008, seeking a determination that the insurance policies overlapped, that he alone was entitled to recover from Nationwide, and that Plaintiff was entitled to recover from Safeco. The state court granted summary judgment both to Safeco and Nationwide, finding that Safeco's policy was not in effect at the time the fire occurred, and that even if it had been, an "escape clause" in the policy which provided that the insurance policy would not apply if other insurance was in place prevented recovery from Safeco.[7] With respect to Nationwide, the court found that the Nationwide policy provided coverage for the fire loss and that the language of Nationwide's policy required it to make the check payable to Carrington as a joint payee and that Defendant Riley had no grounds for arguing that the check should be payable to him only; thus, it found that the check issued to both Defendant Riley and Plaintiff was proper.[8]

On September 11, 2007, Nationwide issued a check for the fire loss in the amount of $289,000, jointly payable to Defendant Riley and Plaintiff. The check was not cashed before it became stale, and Nationwide issued another check on May 5, 2009 for the same amount, again jointly payable to Defendant Riley and Plaintiff. That check was deposited into a Bank of America account on May 11, 2009 and contained the signature of Defendant Riley and a stamped indorsement, "Carrington Mortgage for Deposit Only."[9]

Defendant Riley filed his chapter 13 bankruptcy petition on June 29, 2009, and was assigned case number 09-04740-dd. On motion of Joy Goodwin, the chapter 13 trustee assigned to Defendant Riley's bankruptcy case, Defendant Riley's chapter 13 case was involuntarily

---

[7] The Order Granting Safeco's Motion for Summary Judgment was admitted into evidence as Plaintiff's Exhibit H and Defendant Riley's Exhibit 18. It was filed in the state court action on March 24, 2009.

[8] The Order Granting Nationwide's Motion for Summary Judgment was admitted into evidence as Plaintiff's Exhibit G and Defendant Riley's Exhibit 18. It was entered in the state court action on March 24, 2009.

[9] A copy of the check with Defendant Riley's and Plaintiff's indorsements was admitted into evidence as Plaintiff's Exhibit K.

6

converted to chapter 7 on December 14, 2009.[10] After Defendant Riley's case was converted, Trustee was appointed as the chapter 7 trustee in Defendant Riley's chapter 7 case. The United States Trustee commenced an adversary proceeding against Defendant Riley on January 28, 2010, seeking to deny Defendant Riley's discharge based on misrepresentations made in his Schedules and Statements, and after Defendant Riley failed to respond, an Order Denying Discharge and Default Judgment Denying Discharge were entered on March 17, 2010.

Defendant Riley's Summary of Schedules filed on July 13, 2009 reflects total assets of $136,925 and total liabilities of $478,220; thus, Defendant Riley was insolvent when he filed his bankruptcy case. Defendant Riley's amended Statement of Financial Affairs ("SOFA"), filed on August 10, 2009, while his case was still pending under chapter 13, lists $478,000 as "2007 income from insurance company due to house fire. $190,000 went to home contractor to begin rebuilding." Separately, the SOFA lists $289,000 as "2009 funds from insurance company to build house. Note: $100,000 listed on Schedule B. Remaining amount has been distributed to builder." Schedule B, filed July 13, 2009, lists $100,000 in a checking account with Bank of America. Schedule B states, "Note: all funds are from insurance proceeds to build a house." Defendant Riley's Schedule C claims an exemption in "checking with BOA" of $51,450 under S.C. Code § 15-41-30(A)(1), the homestead exemption.[11] At some point prior to Defendant Riley's bankruptcy filing, he opened a certificate of deposit with Bank of America in the amount

---

[10] Joy Goodwin, the chapter 13 trustee appointed in Defendant Riley's chapter 13 case, brought the Motion to Convert to Chapter 7 on December 1, 2009. Defendant Riley filed a Motion to Dismiss his chapter 13 case on December 3, 2009 and filed a Reply to Ms. Goodwin's Motion to Convert on December 11, 2009. The Court entered an Order Granting Motion to Convert and Denying Motion to Dismiss on December 15, 2009, and entered a Supplemental Order on Motion to Convert on December 21, 2009.

[11] No objection to this claimed exemption was filed, but a Consent Order was entered on September 8, 2010 indicating that there is an issue regarding the exemption and that an adversary proceeding will be filed to resolve issues regarding Carrington's lien and Defendant Riley's claimed exemption.

7

of $136,750.[12] Those funds, which the parties stipulated can be traced to the insurance policy proceeds, are the subject of this action.

Defendant Riley testified during his bankruptcy case that he received a check in the amount of $198,000 from Nationwide in 2007 for the contents of his home that were destroyed in the fire. He further testified that he received a second check for the damage to the house on May 5, 2009, in the amount of $289,000. This Court previously determined that this testimony is not consistent with Defendant Riley's representations in his SOFA.[13] At the trial in this matter, Defendant Riley testified that after the home burned, due to pressure from the neighborhood homeowners' association, he paid $45,000 to a demolition company to have it tear down the remaining structure, and that demolition was completed. Defendant Riley testified that he then found a flyer in his mailbox providing the name and telephone number of a contractor offering to construct a new home. Defendant Riley testified that he contacted the contractor and paid him between $75,000 and $80,000 to begin construction of the home. Defendant Riley testified that a few weeks later, he was unable to find or contact the contractor, and no progress had been made on a new home.

Despite making numerous arguments in the various pleadings filed in this adversary proceeding, the parties focused largely on a few points throughout the trial. Plaintiff did not

---

[12] It appears that this $136,750 is the same money that Defendant Riley's Schedules listed as $100,000 in a checking account with Bank of America.

[13] "These disclosures [of 2007 and 2009 income in the SOFA] are not consistent with Debtor's testimony that he received $198,000 in 2007 and $289,000 in 2009." Supplemental Order on Motion to Convert Case to Chapter 7, docket #72, Case No. 09-04740-dd (December 21, 2009). In the same Order, the Court stated: "The Court now finds that the Debtor's actions in this case have reached the level of egregious conduct warranting the denial of Debtor's Motion to Dismiss. Debtor is a serial filer. This is Debtor's third bankruptcy filing since November of 2006. Both of Debtor's previous cases were dismissed without any dividend being paid to Debtor's unsecured creditors. Additionally, Debtor's conduct in this case demonstrates a pattern of continued abuse of the bankruptcy system. Debtor has been uncooperative with the Trustee in as much as he has failed to provide documents in a timely manner or in some cases, not at all. Debtor claims to have paid $90,000 to a builder for the reconstruction of his residence, but will not disclose the name of this builder. Debtor's testimony regarding how he spent $198,000 he received for the contents of his house lacked credibility. He claims that the money was spent on clothes and otherwise, without elaboration. Further, Debtor's testimony regarding his receipt of the $289,000 insurance check, Carrington's endorsement of that check, and his deposit lacks credibility."

8

produce any witnesses but argued that the notes, mortgages, and assignments are facially valid and establish Plaintiff's perfected lien on Defendant Riley's real property, that the state court had previously found that Plaintiff has an interest in the insurance proceeds, and that therefore Plaintiff is entitled to the funds being held by Trustee.  Defendant Riley focused largely on his contention that the assignments of the notes and mortgages from New Century to Plaintiff were not valid because they were signed by Frank Mercado, who Defendant Riley argues was a "robo signer" and did not have authority to sign on New Century's behalf.  In further support of this argument, Defendant Riley introduced into evidence as Exhibit 4 and Exhibit 5 reports completed by Michael J. Missal, the examiner in New Century's bankruptcy case in the District of Delaware.  The reports detail certain problem practices in the mortgage industry in general, as well as specific issues with New Century's business practices.  As a result of this, Defendant Riley argued that Plaintiff does not have standing to bring this action.   Defendant Riley also argued that Plaintiff had not satisfied its burden of proof because it did not produce a witness to establish that Frank Mercado had authority to sign on New Century's behalf.  Defendant Riley conceded at trial that even if he was successful in establishing that the assignment of the notes and mortgages to Plaintiff were not valid, he still owes New Century or its successor.  The amount of Plaintiff's claim was not contested, other than as discussed below, and therefore Defendant Riley concedes that he owes a mortgagee, whoever that may be, $320,191.42 on the first mortgage and $76,394.81 on the second mortgage. Finally, Defendant Riley argued that Plaintiff's proof of claim as to the second mortgage should be disallowed because Plaintiff filed a Form 1099-C in 2008 showing that Defendant Riley and Ms. Spigner's debt to Plaintiff, in the amount of $74,080, had been cancelled.[14]  However, Defendant Riley's credit report and the

---

[14] A copy of the Form 1099-C as to Ms. Spigner was admitted as Defendant Riley's Exhibit 1, and a copy of a Wage and Income Transcript for Defendant Riley was admitted as Defendant Riley's Exhibit 2.  A copy of Defendant

9

Form 1099-C are the only evidence presented in support of this argument; those documents are not dispositive, and there is no evidence that the note has been satisfied.

Trustee contends that the certificate of deposit is not subject to any lien or, if there is a lien, his status under 11 U.S.C. § 544 is superior to any lien. He seeks to distribute the funds to unsecured creditors.

The parties failed to reserve any evidentiary objections in their Pre-Trial Order, and as a result, all exhibits introduced by either Plaintiff or Defendant Riley were admitted into evidence, despite both parties' contention that they had not agreed to admission of all exhibits. Defendant Riley introduced twenty exhibits, many of which were not relied on by Defendant Riley in the presentation of his case.[15] Defendant Riley relied heavily on Exhibit 14, the deposition of Frank Mercado, Jr., in support of his argument that Mr. Mercado did not have authority to execute documents on New Century's behalf. In addition to the documents identified above as Plaintiff's

---

Riley's Equifax credit report showing a balance of $0 on the second mortgage was introduced as Defendant Riley's Exhibit 3.

[15] Those exhibits admitted into evidence but not relied on by Defendant Riley at trial are as follows:
Exhibit 8-Stipulation Among New Century Mortgage Corporation, Carrington Mortgage Services LLC and Symantec Corporation Authorizing Assumption and Assignment of Software License, from New Century's bankruptcy case in the District of Delaware, Case No. 07-10416 (KJC).
Exhibit 9-Second Amended and Restated Asset Purchase Agreement between Carrington Capital Management, LLC, Carrington Mortgage Services, LLC, New Century Financial Corporation, and New Century Mortgage Corporation, dated May 21, 2007.
Exhibit 10-Response to Substantive Objection by New Century Liquidating Trust to Carrington Securities L.P.'s Claims for Forced Liquidation of Certain Loans, from New Century's bankruptcy case in the District of Delaware, Case No. 07-10416 (KJC).
Exhibit 11-Order Approving Sale of New Century's Servicing Business to Plaintiff and Approving Assumption and Assignment of Certain Executory Contracts and Unexpired Leases, from New Century's bankruptcy case in the District of Delaware, Case No. 07-10416 (KJC).
Exhibit 12-Motion of Deutsche Bank National Trust Company, as Trustee c/o Ocwen Loan Servicing, LLC for Relief from Automatic Stay under Section 362 of the Bankruptcy Code, from New Century's bankruptcy case in the District of Delaware, Case No. 07-10416 (KJC).
Exhibit 13-Form 8-K dated August 25, 2005, for Carrington Mortgage Loan Trust Series 2005-NC1 Asset Backed Pass-Through Certificates, Series 2005-NC1, File No. 333-113636-34.
Exhibit 15-Releases of Mortgages/Deeds of Trust for parties not involved in this case, notarized by Frank Mercado, Jr.
Exhibit 17-Summary Structural Evaluation of 34 Crossbow Lakes Court, Columbia, SC, prepared by Chao and Associates, Inc., August 2008.
Exhibit 19-Prospectus for Carrington Mortgage Loan Trust/Series 2005-NC1, filed on February 2, 2005.
Exhibit 20-Defendant Riley's insurance policy with Nationwide.

exhibits, Plaintiff also introduced into evidence its foreclosure complaint, filed in the Court of Common Pleas for Lexington County,[16] Defendant Riley and Ms. Spigner's answer to the foreclosure complaint,[17] and a portion of a deposition taken of Defendant Riley.[18]

## CONCLUSIONS OF LAW

### I. Debtor's Standing to Challenge Proofs of Claim and Contest Note and Mortgage Assignments

"The general rule in the Fourth Circuit is that a Chapter 7 debtor only has standing if it can be demonstrated that he has a pecuniary interest in the distribution of his assets among his creditors." *Anderson v. Simchon et al (In re S. Textile Knitters, Inc.)*, No. 98-07203-W, Adv. No. 99-80026-W, 1999 WL 33485638, at *3 (quoting *Willemain v. Kivitz*, 764 F.2d 1019, 1022–23 (4th Cir. 1985)).  *See also Willemain v. Kivitz*, 764 F.2d 1019, 1022–23 (4th Cir. 1985) (quoting *Kapp v. Naturelle, Inc.*, 611 F.2d 703, 706–07 (8th Cir. 1979)).  Because an insolvent debtor does not stand to receive any funds from the administration of his estate, he has no pecuniary interest in such administration and therefore lacks standing to object to the validity of proofs of claim filed in his bankruptcy case.  *See Willemain*, 764 F.2d at 1022–23; *In re Miller*, No. RWT 10cv2466, 2011 WL 3758712, at *3 (D. Md. Aug. 24, 2011); *In re Walker*, 356 B.R. 834, 848 (Bankr. S.D. Fla. 2006); *In re Lapointe*, 39 B.R. 80 (Bankr. W.D. Ky. 1984).  "[I]t is the trustee's job, not the debtor's, to examine proofs of claim and to object to the allowance of any claim that is improper." *Walker*, 356 B.R. at 848.  Defendant Riley is an insolvent chapter 7 debtor and has no standing to challenge Plaintiff's proofs of claim.

---

[16] Exhibit I
[17] Exhibit J
[18] Exhibit L

11

As to the mortgage assignment issue, this Court has recently held that a borrower may not attack the validity of assignments of his loan due to his status as a third party to the assignment. *In re McFadden*, 471 B.R. 136, 161 (Bankr. D.S.C. 2012). Defendant Riley argues against this precedent and attempts to attack the assignment of his notes and mortgages from New Century to Plaintiff as invalid because Mr. Mercado, who signed the assignment on behalf of New Century, was a "robo signer." In support of this argument, Defendant Riley makes reference to Mr. Mercado's deposition in which he testified that he considered himself to be a vice president of New Century "in name only", that he never received compensation from New Century, that he was signing documents which were pre-filled out, and that he was unsure of the significance of the documents he was signing. Defendant Riley ascribes great significance to the fact that Mr. Mercado is not listed as a vice president of New Century in Exhibit 5, the bankruptcy examiner's report from New Century's bankruptcy case in the District of Delaware.

First, while the bankruptcy examiner's report does contain a listing of "key personnel" at New Century, the report never purports to contain an exhaustive list of all officers of New Century. Second, and more importantly, Mr. Mercado also testified as follows:

Q:[19] I think you testified already that you believed you had been delegated authority to act on behalf of New Century; is that correct?

A: Yes.

Q: And did you believe that your actions were binding on New Century?

A: Yes.[20]

Because he is insolvent and because he is a borrower, Defendant Riley does not have standing to object to Plaintiff's proofs of claim or to attack the assignment of his notes and

---

[19] Questions asked by Mr. Whitt, Plaintiff's counsel.
[20] Exhibit 14, Deposition of Frank Mercado, pg 44, line 9 to line 15.

12

mortgages from New Century to Plaintiff. Even if Defendant Riley did have such standing, the evidence he presented in an attempt to show Mr. Mercado did not have authority to sign on New Century's behalf was wholly insufficient. No dispute exists regarding the validity of the notes and mortgages, and Defendant Riley has not produced evidence sufficient to call into question the validity of the assignment of the notes and mortgages. Plaintiff is the proper party to this action and has standing to assert its claims before this Court.

### II.    Equitable Lien

Plaintiff claims an equitable lien in the funds in Defendant Riley's Bank of America certificate of deposit account.[21] An equitable lien arises under South Carolina law if three requirements are satisfied: "(1) a debt owed from one person to another, (2) specific property to which the debt attaches, and (3) express or implied intent for the property to serve as security for payment of the debt." *In re Lloyd*, 458 B.R. 295, 300 (Bankr. D.S.C. 2011) (citing *In re Houston*, 409 B.R. 799, 811 (Bankr. D.S.C. 2009)). Other well-established equitable principles must also be considered in determining the existence of an equitable lien. *Horry County v. Ray*, 674 S.E.2d 519, 524 (S.C. Ct. App. 2009). South Carolina courts have repeatedly held that if a mortgage requires the mortgagor to maintain insurance on the mortgaged property, the mortgagee has an equitable lien on insurance proceeds resulting from a property loss. *Knapp v. Victory Corp.*, 302 S.E.2d 330, 331 (S.C. 1983); *Blackwell v. State Farm Mut. Auto. Ins. Co.*, 118 S.E.2d 701, 704 (S.C. 1961) (citing *Farmers' & Merchants' Nat'l Bank of Lake City v. Moore*, 133 S.E. 913 (S.C. 1926); *Swearingen v. Hartford Fire Ins. Co.*, 29 S.E. 722 (S.C. 1898); 47 A.L.R. 1001; Annotation, 92 A.L.R. 559 (1934)). Both the first and second mortgage

---

[21] These funds are now in the control of Trustee.

executed by Defendant Riley contain clauses requiring Defendant Riley to maintain insurance on the property, and the Nationwide policy listed Plaintiff as a loss payee.[22]

South Carolina law recognizes, upon proper proof, an equitable lien on insurance proceeds in favor of a mortgagee. South Carolina law also provides that an equitable lien arises following the entry of a judgment recognizing its existence. *Lloyd*, 458 B.R. at 300 (citing *In re Houston*, 409 B.R. 799, 811 (Bankr. D.S.C. 2009)); *First Fed. Sav. & Loan Ass'n v. Bailey*, 450 S.E.2d 77, 81 (S.C. Ct. App. 1994) ("An equitable lien is a mere floating equity until a judgment or decree subjecting the property to the payment of the debt or claim is rendered."). The cases the Court has found which hold that a mortgagee has an equitable lien on insurance proceeds all involve a contract between the mortgagor and mortgagee requiring that the mortgagor maintain insurance. *See Knapp v. Victory Corp.*, 302 S.E.2d 330 (S.C. 1983) (holding, in a dispute between first and second mortgagee regarding entitlement to insurance proceeds, that because both mortgages required the mortgagor to maintain insurance on the property, both mortgagees had a claim to the proceeds and that the first mortgagee was entitled to recover a portion of the proceeds to the extent of the insured amount, with the second mortgagee to recover the remainder); *Blackwell v. State Farm Mut. Auto. Ins. Co.*, 118 S.E.2d 701 (S.C. 1961) (holding that a bank holding a chattel mortgage on an automobile damaged in a collision had an equitable lien in insurance proceeds because the mortgage required mortgagor to insure the vehicle and

---

[22] Plaintiff relied heavily on the Rooker-Feldman doctrine in his pleadings and his argument at trial, arguing that the state court orders granting summary judgment to Nationwide and Safeco were entitled to preclusive effect. The Rooker-Feldman doctrine prevents lower federal courts from considering "'issues actually presented to and decided by a state court' or 'constitutional claims that are inextricably intertwined with questions ruled upon by a state court.'" *Friedman's, Inc. v. Dunlap*, 290 F.3d 191, 196 (4th Cir. 2002) (quoting *Plyler v. Moore*, 129 F.3d 728, 731 (4th Cir. 1997)). Under the doctrine, the federal court does not have jurisdiction if considering the federal claim would be equivalent to undertaking appellate review of the state court's decision. *Id.* (quoting *Jordahl v. Democratic Party of Va.*, 122 F.3d 192, 202 (4th Cir. 1997)). The state court decisions determined that Plaintiff had an interest in the Nationwide insurance proceeds; however, Plaintiff was not a party to the litigation, which construed the provisions of an insurance contract concerning coverage, policy overlap, and the effect of a mortgage clause. The issue in the state court litigation was not the existence of an equitable lien. Therefore, it is not necessary for the Court to examine or discuss the Rooker-Feldman doctrine further.

14

name mortgagee as a loss payee); *Cromer v. Cromer*, 360 S.E.2d 528 (S.C. 1987) (holding, where two brothers were involved in a partnership operating a business in a barn and one brother purchased insurance on the barn, which later burned, that the partner who did not purchase insurance had an equitable lien because the insurance was taken out for the benefit of the partnership and therefore, the insurance company was jointly and severally liable to both brothers). *See also Swearingen v. Hartford Ins. Co.*, 29 S.E. 722 (S.C. 1898); *Lewis v. Aynor Farm Ctr.*, 348 S.E.2d 537 (S.C. Ct. App. 1986); *Freshwater v. Colonial Prod. Credit Assoc.*, 334 S.E.2d 142 (S.C. Ct. App. 1985). Thus, the mortgagee's entitlement to insurance proceeds resulting from a property loss is akin to and arises from a contract right or expectation. In a case involving a mortgagor and mortgagee, an equitable lien can arise by virtue of the parties' rights and obligations under their contract. The rule requiring the entry of a judgment before an equitable lien is recognized benefits third parties who are not parties to the contract.

Plaintiff has the burden of proof as to each element of a cause of action to establish an equitable lien. Defendant Riley clearly owes a debt to Plaintiff. The debt is secured by a mortgage in Defendant Riley's real property. The mortgage requires Defendant Riley to maintain certain insurance coverage, and South Carolina has extended a lien to the proceeds paid under an insurance policy following damage to or destruction of the collateral. Thus, the debt and attachment elements are satisfied.

The failing of Plaintiff's case rises from the third element and other equitable considerations. The evidence presented regarding Defendant Riley and Plaintiff's intent consisted of the mortgage language requiring insurance, the Nationwide insurance policy, and the Nationwide check payable to Defendant Riley and Plaintiff. No other evidence of intent was offered. The mortgage provisions and policy fit squarely with Plaintiff's plea for an equitable

15

lien. The check and its indorsement do not. Plaintiff has the burden of proof on the issue of the parties' intent, and its proof is deficient.

Throughout the course of this litigation, counsel for Plaintiff has asserted that Plaintiff's indorsement was forged and has implied that the forged indorsement was executed by Defendant Riley. Plaintiff's counsel has consistently represented to the Court that Plaintiff would provide proof of this at trial. However, the only document presented to the Court on this issue was an affidavit from a senior vice president of Plaintiff attached to the complaint. Plaintiff had no witness at trial to testify regarding Plaintiff's indorsement practices. Other than the affidavit and Plaintiff's counsel's statements to the Court, which are not evidence, the record is silent regarding Plaintiff's indorsement, and the indorsement is valid on its face. The parties' pre-trial stipulation of facts remaining to be litigated expressly acknowledges the dispute over "[t]he facts that resulted in the insurance proceeds finally arriving in a CD account at Bank of America that was seized by the Trustee." The Court is left to speculate as to the meaning of the insurance proceeds check and the otherwise unexplained indorsement. The mortgage provisions supplied authority for Plaintiff retaining and administering the funds, yet the funds were in the possession of Defendant Riley. Plaintiff is not aided by the Court's earlier finding that Defendant Riley's statements regarding the indorsement were not credible.[23] In his previous testimony, Defendant Riley did not concede anything factually, and in fact vehemently maintained that he did not place Plaintiff's indorsement on the check. Even if Defendant Riley's legal theories concerning

---

[23] *See* Supplemental Order on Motion to Convert Case to Chapter 7, docket #72, Case No. 09-04740-dd (December 21, 2009). At the hearing on the Motion to Convert, Defendant Riley testified that Plaintiff sent him the check by mail, he sent it back to Plaintiff's loss mitigation department, where it was signed and mailed back to him to cash. In response to further questioning regarding the timing of the issuance and deposit of the check, Defendant Riley testified that after the check was issued on May 5th and mailed to him, he sent the check by overnight mail to Plaintiff, and Plaintiff sent it back by overnight mail, such that he was able to deposit the check on May 11. Defendant Riley testified that he did not sign Plaintiff's indorsement on the check but did not know who did.

16

insurance law are not well-supported, Plaintiff must independently meet its burden of proof on the issue of the intent of the parties.

Plaintiff has not established its equitable lien in the insurance proceeds. The funds are incontrovertibly property of Defendant Riley's bankruptcy estate. The Court need not consider Trustee's contention that his section 544 powers preempt Plaintiff's claim of a lien. The funds are available for administration by Trustee. Despite reserving the right to argue the issue of Defendant Riley's entitlement to an exemption in the funds in a previous consent order, the parties did not present any argument relating to the exemption during the trial of this adversary proceeding. The issue of Defendant Riley's claim of an exemption is now ripe for consideration. Trustee is directed to file his objection to Defendant Riley's exemption, if any, within thirty (30) days from the entry of this Order. Following a response, if any, the matter will be set for hearing.

### III. South Carolina Unfair Trade Practices Act

Defendant Riley's complaint asserts a counterclaim against Plaintiff pursuant to the South Carolina Unfair Trade Practices Act ("Act") and requests treble damages. The Act is found at S.C. Code § 39-5-10 et seq. and provides, in relevant part:

> (a) Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful.
> (b) It is the intent of the legislature that in construing paragraph (a) of this section the courts will be guided by the interpretations given by the Federal Trade Commission and the Federal Courts to Section 5(a)(1) of the Federal Trade Commission Act (15 U.S.C. 45(a)(1)), as from time to time amended.

S.C. Code § 39-5-20 (1976). Defendant Riley's counterclaim does not set forth specific allegations regarding the conduct he claims violates the Act. Instead, Defendant Riley merely states, "The actions of the Plaintiff, above-described, constitute unfair and deceptive acts and practices in the conduct of trade and commerce, as prohibited by the South Carolina Unfair

17

Trade Practices Act, § 39-5-10 et.seq. [sic] and are knowing and willful violations thereof." Defendant Riley's Amended Answer, docket # 34, at pg 7. At trial, as discussed above, Defendant Riley presented evidence that Mr. Mercado, a vice president of New Century, was a "robo signer" and further, that New Century engaged in improper conduct relating to its mortgage loans, which were later assigned to Plaintiff. Defendant Riley did not make any specific allegations with respect to Plaintiff's conduct.

In order to establish a cause of action under the Act, the claimant must establish that the defendant engaged in unfair or deceptive acts or practices affecting the public interest while conducting any trade or commerce. *Hollman v. Woolfson*, 683 S.E.2d 495, 499 (S.C. 2009) (citing S.C. Code § 39-5-20(a); *Singleton v. Stokes Motors, Inc.*, 595 S.E.2d 461 (2004)). A claimant can establish that the acts complained of have an impact on the public interest by establishing that such acts or practices have the potential for repetition. *Id.* (citing *Singleton v. Stokes Motors, Inc.*, 595 S.E.2d 461 (2004)). "The potential for repetition may be proven by showing: (1) the same kind of actions occurred in the past, thus making it likely they will continue to occur absent deterrence; or (2) the defendant's procedures created a potential for repetition of the unfair and deceptive acts." *Id.* (citing *Singleton v. Stokes Motors, Inc.*, 595 S.E.2d 461 (2004)).

Defendant Riley introduced into evidence a report by the bankruptcy examiner appointed in New Century's bankruptcy case. The report detailed problems with New Century's business practices and procedures, as well as the mortgage industry in general. Defendant Riley also introduced Mr. Mercado's deposition, in which he testified regarding his duties as a signatory for New Century. Thus, although probably not sufficient to establish a claim under the Act, Defendant Riley did present evidence tending to show that New Century engaged in improper

18

acts which affected the public and were frequently repeated. The problem, however, is that all of this evidence related to New Century and not Plaintiff. No evidence was presented to show Plaintiff engaged in any unfair or deceptive acts or practices. Defendant Riley did not establish a cause of action under the South Carolina Unfair Trade Practices Act as to Plaintiff and cannot prevail on his counterclaim. Finally, to the extent a cause of action under the Act does exist and has merit, it belongs to the bankruptcy estate, is subject to administration by Trustee, and is not available to Defendant Riley.

## **CONCLUSION**

For the reasons set forth above:

1. Plaintiff's proofs of claim are allowed as secured claims with liens attaching only to the real property;

2. Trustee is entitled to administer the funds from the Bank of America certificate of deposit for the benefit of creditors; and

3. Defendant Riley did not establish a claim under the South Carolina Unfair Trade Practices Act and is not entitled to damages or other relief on his counterclaim.

Trustee is ordered to file his objection to Defendant Riley's exemption, if any, within thirty (30) days from the date of entry of this Order.

AND IT IS SO ORDERED.